HYNDS v. FOURTEENTH STREET STORE.

(Supreme Court, Appellate Division, First Department. December 31, 1913.)

1. LIBEL AND SLANDER (§ 123*)—LIBEL PER SE—PRESUMPTION.
   Where an article is libelous per se, and the defendant does not prove privilege, damages are presumed, and the only question for the jury is the amount of the damage; but, if an article be susceptible of more than one meaning and is not necessarily libelous per se, then that question is for the jury.
   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.*]

2. LIBEL AND SLANDER (§ 9*)—LIBELOUS PER SE—WHAT CONSTITUTES.
   Falsely to charge a person engaged in business with bankruptcy is libelous per se.
   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 80–90; Dec. Dig. § 9.*]

3. LIBEL AND SLANDER (§ 123*)—ACTIONS—JURY QUESTION.
   In a libel suit for falsely charging plaintiff with bankruptcy, the question whether the libel was directed against plaintiff *held* for the jury.
   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.*]
   Scott, J., dissenting.

Appeal from Trial Term, New York County.

Action by Therese Hynds against the Fourteenth Street Store. From a judgment dismissing the complaint at the close of the case, plaintiff appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Begg, Begg & Begg, of New York City (Walter L. Rathborne, of New York City, of counsel, and Roderick Begg, of New York City, on the brief), for appellant.

Rose & Paskus, of New York City (Benjamin G. Paskus, of New York City, of counsel, and Jacob Scholer, of New York City, on the brief), for respondent.

CLARKE, J.   This action was brought for libel.   The complaint avers that the defendant is a domestic corporation engaged in general retail business in the city of New York; that for 20 years last past plaintiff has been engaged in the business of manufacturing ladies' corsets and has, in that business, obtained a very high reputation, and has invested in said business large sums of money, and has obtained throughout the world a name for herself at the head of such business; that on November 19, 1909, the defendant maliciously and recklessly composed and caused to be published in the Evening World an advertisement, as follows:

"Therese Hynds Corsets Bought at Auction: On Sale Tomorrow Half Her Former Prices.  Bankruptcy Proceedings Necessitated the Sale.  Corsets Formerly $5.00 to $20.00 at Less than half those prices.  To the women who are in the custom of paying liberally for their corsets there is no more familiar name than Therese Hynds.  She established a reputation that extends from New York to San Francisco.  In her booklet entitled 'My Honest Opinion Corsets,' she says in part: 'My story is plain and sincere, made possible by years of earnest effort and experience gained in personally fitting, designing and manufacturing corsets for thousands of the best dressed and most discriminating women in the world, who are to-day and have been for years my exclusive customers, well able to purchase the best garment money can buy.'  We bought too many corsets and too varied an assortment to be able to give the actual details of all the lines, all the styles, and all the fabrics.  Some of the more important of them are here recorded.  The Greatest Sale of Corsets Held in Years.  At the auction of the Therese Hynds bankrupt stock, we bought 1,000 pairs.  Every pair boned with finest Whalon- or Whalebone; not a pair made with steels.  The materials are the finest French Coutils, Silk Batiste, Fancy Broche and Heavy Brocade.  We bought every style that Therese Hynds made, including the lowest priced, and all the in-between priced corsets.  Naturally there are styles for every type of figure—girdle top, medium and high bust, medium and extremely long hips, long backs and a number cut to suit stout women who desire the extra length that comes well over the limbs.  All have the very best grade of heavy webbing supporters attached.  Not old stock, but the newest Directoire Model—the model that will be in vogue this winter and next spring and summer.  All sizes.  Values range $3 to $15.  Our special prices during this sale, $1.25, $1.49, $1.75, $2.49, $2.98, $3.49, $3.98, $5.98."

The complaint proceeds:

"That by said statement defendant meant and intended to charge and did charge that Therese Hynds had become and was bankrupt and was unable to pay her just debts, and that that Fourteenth Street Store had bought at bankruptcy sale all of the stock of the plaintiff, and that at the auction of the Therese Hynds bankrupt stock, they (the Fourteenth Street Store) had bought one thousand (1,000) pairs of Therese Hynds' corsets, and that they (the Fourteenth Street Store) were selling the said corsets at one-half of their usual prices, and by said article so composed and published by the defendant they intended to charge and did charge that they (the Fourteenth Street Store) had bought every style of corset made by plaintiff; whereas, in truth and fact, plaintiff herein has never been in bankruptcy, has never been unable to pay her just debts, and has never sold to the Fourteenth Street Store any of

the corsets manufactured by her." That by reason of said article "she has been damaged in her good name and reputation, and her standing as a business woman has been injured," to her damage in the sum of $50,000.

In the second cause of action, she alleges a similar advertisement containing this additional paragraph:

"She had a factory at 727 Seventh avenue, a shop on fashionable Fifth avenue and other shops in the fashionable districts of the big cities of this country. She was her own manufacturer, designing other models evolved through long years of experience"—published on the 21st of November in the New York American.

The answer, for a separate defense to the first cause of action, both whole and partial, alleged that prior to the alleged publication, and for some time previous thereto, plaintiff had been engaged in the business of manufacturing and selling ladies' corsets and lingerie; that all of the goods and merchandise so manufactured by the plaintiff were marked, known as, and sold under the trade-name "Therese Hynds"; that, in order to facilitate her method of doing business, plaintiff, on or about the 10th of September, 1908, caused two corporations to be organized, one the "Therese Hynds Lingerie Company" and the other the "Therese Hynds Corsetiere Company," and certificates of incorporation were filed in the county clerk's office. Both of the above-named corporations occupied an office in common, which said office was maintained at the residence of the plaintiff. Shortly subsequent to the organization of said two corporations, the "Therese Hynds Manufacturing Company" was organized, and on the 19th of October, 1908, a certificate of incorporation was filed. The "Therese Hynds Manufacturing Company" was organized as a selling agent of the plaintiff's business, and in order to exploit and use the name "Therese Hynds" in connection with all the goods manufactured or sold by it; the said "Therese Hynds Manufacturing Company" exchanged merchandise with the plaintiff and with the other corporations referred to, which were operated in connection with the business of the plaintiff, for the purpose of advertising, exploiting, and using the trade-name "Therese Hynds." All of the corsets and other merchandise sold by the "Therese Hynds Manufacturing Company" were marked and designated with the name or label "Therese Hynds." The said "Therese Hynds Manufacturing Company" borrowed money on notes indorsed by the plaintiff, or one or the other of the two corporations above referred to. The "Therese Hynds Manufacturing Company" possessed the right to and did use in its business the name "Therese Hynds" as a trade-mark on all merchandise manufactured or sold by it, and on all advertisements used in connection with its said business. All of said merchandise so dealt in by the said three companies and this plaintiff was known only by the trade-mark "Therese Hynds."

On or about September 29, 1909, and within one year after the organization of the "Therese Hynds Manufacturing Company," a petition in bankruptcy was filed against said corporation, and thereafter it was adjudged a bankrupt, and Walter C. Low was appointed by an order of the United States District Court a receiver of its assets. In addition to the stock and fixtures belonging to said corporation, there

were in the premises leased and occupied by it, at the time of the appointment of the receiver, machines which were leased to the plaintiff and for which the plaintiff paid the rent, which said machines the "Therese Hynds Manufacturing Company" was allowed to use in connection with its business without any expense to it. There were also in the premises so occupied various patterns which were loaned to said corporation by the plaintiff herein to be used in its business for the purpose of making models for corsets. Before, on, or about the 17th of November, 1909, at 727 Seventh avenue, the entire stock of goods and fixtures of the bankrupt corporation were, pursuant to an order of the United States District Court, sold at public auction by the said receiver in bankruptcy of the said "Therese Hynds Manufacturing Company." On said day this defendant purchased at said sale certain corsets, bust supporters, corset laces, bust forms, labels, pictures, and other articles which were the property of the "Therese Hynds Manufacturing Company." All of said merchandise and articles so purchased at said sale were marked and labeled "Therese Hynds." At the time of the purchase of the merchandise, said defendant also purchased certain labels and advertisements which had been used by the bankrupt corporation, which said labels and advertisements were sold as a part of said bankrupt's assets. That on all of said labels, photographs, and other articles there was the name "Therese Hynds."

For a partial defense, and by way of mitigation and also reduction of damages, the answer repeated the allegations just set forth and alleged that, relying upon the genuineness and authenticity of said name or label on said corsets, this defendant caused a notice or advertisement, a partial copy of which is set forth in the complaint, to be prepared, advertising among others a sale of "Therese Hynds" corsets, and that relying on the truth of the statements and things set forth in said notice or advertisement, and relying on the authenticity of said names or labels heretofore referred to, and believing the same and each and all thereof to be true, it caused a copy of said notice or advertisement to be published in the Evening World, in good faith and without malice to the plaintiff or any other person.

The defendant gave evidence tending to prove the allegations of the answer. Mrs. Hynds testified in her own behalf: That she had been in business for herself 20 years or over. That she was first in business with her mother under the name of Therese White, but for the last 11 years, since her marriage, under the name Therese Hynds. "I have used no other name during that time in my business." "During my business career I was never a bankrupt." That she had never repudiated a debt; had paid one hundred cents on the dollar for her merchandise she had bought. That she had a five-story house at the time of this publication at 11 East Forty-Seventh street. It was a large house, 25 by 90. "I lived in the house and I manufactured corsets in the house." "I took up two of the lofts for the manufacture of corsets, one of the other lofts for reception room and offices. I had, I should say, altogether about 30, 40, or 45 girls on an average the year round." "They manufactured these corsets." "I did the

fitting myself with four assistants." She testified under cross-examination that in September, 1908, she was one of the incorporators of the Therese Hynds Corsetiere Company. This corporation was organized for the purpose of buying, manufacturing, and selling corsets and corset goods of every description. "I was president. It is a fact that I held all of the capital stock except two shares." On the same date a corporation known as the Therese Hynds Lingerie Company was organized. "I was an officer and stockholder of that company. It conducted an underwear business. Besides myself, the other officers of these two companies were my husband, John G. Hynds, and my brother, Francis White. They were directors and officers of both companies." At the time of the publication of these advertisements, both companies had offices at 11 East Forty-Seventh street. "I knew of the incorporation of the Therese Hynds Manufacturing Company. I knew my husband was interested in making up the corporation. * * * The certificate of incorporation * * * bears the signature of my husband and the signature of my brother. They were the same persons who were the incorporators of the Therese Hynds Corset Company."

She said she knew nothing about that company except that there was a company. "I knew my husband was using my name in the corporate title of this company, without my permission; and I knew that the Therese Hynds Manufacturing Company had a factory over on Seventh avenue, * * * and that it was maintaining or did maintain retail stores at different places in the city of New York and elsewhere." It was proved by her husband's testimony taken in the bankruptcy proceedings, and by a proof of debt bearing her signature, which recites that she is the treasurer of the Therese Hynds Corsetiere Company, which she had filed in those proceedings, that the Therese Hynds Manufacturing Company was indebted to the Corsetiere Company to the extent of $12,422.14. ·

"Although I was managing this corsetiere business, knew all about corsets, and was a business woman myself, I never discussed the kind of corsets they were making in the Seventh Avenue business, how they were advertising, or anything about the business at all, because I was always too busy. Q. How did you know the money was advanced, the moneys, you advanced was for rent and pay rolls? A. You forget that fact, that he was my husband. Q. And he told you they were pay rolls? A. He was my husband; that is all I can say. He had the right. * * · * He might have stated the purpose for which the moneys were loaned, but I really don't remember. * * * I don't remember giving them permission to use the name 'Therese Hynds' in connection with the Seventh Avenue business. I didn't refuse him the use of the name Therese Hynds, when he filed an incorporation certificate in the name of the company, and used it in his place and business. Could I prevent him? I did not make any attempt to prevent him. It is not likely. I did tell him that I objected to the use of the name 'Therese Hynds' in connection with the Seventh Avenue business, several times; but he paid no attention to me. I kept on advancing money, knowing the business was using the name 'Therese Hynds'; that is right. I didn't know what the money was for; I just advanced the money, but I knew they were using the name 'Therese Hynds.' I knew the name of the corporation and the business. I never asked my husband to report to me just how he was using the name 'Therese Hynds' in connection with the corsets that were made in that business. * * * Well, I asked my husband how he thought I could prosper in business if he used my name. He didn't say anything, your honor; he just went right on using it."

She was asked what she had to say to the testimony of her husband, who said, in answer to the question what were the dealings between the two corporations, and what the operations were, "The Therese Hynds Manufacturing Company was organized to exploit and use the trade-name of the Therese Hynds corsets," and she said:

"I don't know that the Therese Hynds Manufacturing Company was organized to exploit or use the trade-name of the Therese Hynds corset. I am not prepared to say that it is not true; I don't know what to say. * * * Q. I asked you whether your husband's testimony to that effect that the purpose was that they would make a higher grade corset in the Forty-Seventh street place? A. Is that my husband's testimony? Q. I am reading from the minutes. A. Well, then, it is true. Q. Then it is true? A. Yes, if that is my husband's testimony. * * * Well, now, on another point, assume that your husband testifies: * * * 'Q. Is this trade-name of "Therese Hynds" a well-known and valuable one? A. It is, loaned by the Corsetiere Company by word of mouth' * * * would you say that he told the truth in that testimony? A. The name 'Therese Hynds' is my name. I never loaned the trade-name 'Therese Hynds' to any company except the Corsetiere Company, which I organized. If my husband so testified and swore to it and subscribed to his testimony to the effect that the trade-name 'Therese Hynds' was loaned by the Corsetiere Company to the Therese Hynds Manufacturing Company, I would say that he was testifying to the truth. I think my husband told the truth, but I didn't authorize anybody to use my name 'Therese Hynds.' If he testified as a fact that the trade-name 'Therese Hynds' was loaned to the Therese Hynds Manufacturing Company, he was telling the truth; but I don't remember ever having given any authority for my name to be used. * * * I cannot say my husband told a lie."

There is thus the evidence of the relations of these three companies all making use of the name "Therese Hynds." There was a mass of evidence as to the written script name "Therese Hynds" which was on all the corsets and other things, order blanks, and advertisements of the manufacturing company. One of these corporations, the Therese Hynds Manufacturing Company, did go into bankruptcy, and the corsets advertised in the article complained of were bought by the defendant at the bankrupt sale under the direction of the receiver of said company. There is no question of that. But the plaintiff was not a stockholder or officer in that company. She is still in business for herself and has never been in bankruptcy. The difficulty with the case is that the court dismissed the complaint.

The article uses the personal pronoun:

"Therese Hynds Corsets, Half Her Former Prices." "There is no more familiar name than Therese Hynds." "She established a reputation." "In her booklet she says: 'My story.' She had a factory at 727 Seventh Avenue, a shop on fashionable Fifth Avenue." "At the auction of the Therese Hynds bankrupt stock, * * * we bought every style that Therese Hynds made." "She was her own manufacturer." "She made only the finest high-class corsets, priced at from $5.00 to $25.00."

[1-3] While all the matters proved in evidence tend to the reduction and mitigation of damages and to partial justification, the defense has not justified or attempted to justify the particular charge made in the complaint, which is that the article complained of charged her with being a bankrupt. A course of business and proceedings has been shown proper to submit to a jury in determining how much, if any, damages it would give if it should determine the plaintiff entitled to

a verdict; but the court has disposed of the whole matter as a matter of law.

It is settled that in a libel suit if the defendant does not justify or prove privilege, and the article is libelous per se, damages are presumed, and the case must be submitted to the jury solely to determine the amount of damages. Speaking of words which tend to injure one in his trade or occupation, Andrews, J., said, in Moore v. Francis, 121 N. Y. 199, 23 N. E. 1127, 8 L. R. A. 214, 18 Am. St. Rep. 810:

"The case of words affecting the credit of a trader, such as imputing bankruptcy or insolvency, is an illustration. The action is maintainable in such a case, although no fraud or dishonesty is charged, and although the words were spoken without actual malice."

In Morrison v. Smith, 177 N. Y. 366, 69 N. E. 725, Gray, J., said:

"The language used is to be understood by judge and jury in the same manner as others understand it, and words are to be taken in that sense, which would be naturally conveyed to persons of ordinary understanding. * * * If the language is unambiguous, whether it is actionable becomes a question of law; but if ambiguous and capable of an innocent, as well as of a disgraceful meaning, the question becomes one for the jury to settle. When the defamatory meaning is not apparent, innuendo is necessary. If the words are incapable of the meaning ascribed to them by the innuendo and are, prima facie, not actionable, the complaint should be dismissed. If they are capable of such a meaning, however improbable it may appear, the jury should say whether they may be so understood."

In Klaw v. New York Press Co., 137 App. Div. 686, 122 N. Y. Supp. 437, Mr. Justice Laughlin said:

"If the article be susceptible of only one meaning, then the question whether or not it is libelous per se is to be decided as matter of law by the court. * * * If it be susceptible of more than one meaning, one of which would make it libelous, then it is the office of an innuendo to charge the libelous meaning, and it would be for the jury to determine whether or not the libelous meaning would be ascribed to it by readers of ordinary and average intelligence. * * * If it be equivocal or ambiguous and not necessarily libelous per se, and a libelous meaning of which it be susceptible in one view that may reasonably be taken of it be charged by innuendo, then it will withstand a demurrer, for the plaintiff would in that event be entitled to have the jury instructed that, if the publications would be understood by the reader of average and ordinary intelligence and ability in the libelous sense, then the article is libelous per se, and the plaintiff would be entitled to recover general damages without pleading or proving special damages"—citing cases.

Falsely to charge a person engaged in business, to whom commercial credit is of the utmost importance, with bankruptcy, is libelous per se. The innuendo charges that the article complained of was intended to and did charge the plaintiff with being a bankrupt. If, upon the whole case, there was doubt whether the article was susceptible of that interpretation, then the case should have been submitted to the jury for their determination. The justification was not as broad as the charge. It was error to dismiss the complaint.

The judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

INGRAHAM, P. J., and DOWLING and HOTCHKISS, JJ., concur. SCOTT, J., dissents.